**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 14-3063

_____

ARROWPOINT CAPITAL CORP.,
                                        Appellant

v.

ARROWPOINT ASSET MANAGEMENT, LLC;
ARROWPOINT PARTNERS GP, LLC; ARROWPOINT
PARTNERS GP2, LLC; ARROWPOINT FUNDAMENTAL
OPPORTUNITY FUND, LP; ARROWPOINT
STRUCTURED OPPORTUNITY FUND, LP

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-10-cv-00161)
District Judge:  Hon. Gregory M. Sleet

_____

Argued
March 18, 2015

Before:   SMITH, JORDAN, and SLOVITER, *Circuit
Judges*.

(Opinion Filed: July 16, 2015)
_____

Corby C. Anderson   [ARGUED]
Matthew S. DeAntonio
Nexsen Pruet
227 W. Trade St. – Ste. 1550
Charlotte, NC   28202

Michael W. Arrington
Parkowski, Guerke & Swayze
800 King St. – Ste. 203
Wilmington, DE   19801
       *Counsel for Appellant*

Todd Anthony Coomes
Robert W. Whetzel
Richards, Layton & Finger
920 N. King St.
Wilmington, DE   19801

Jaclyn H. Grodin
Lewis D. Prutzman   [ARGUED]
Tannenbaum, Helpern, Syracuse & Hirschtritt
900 Third Avenue
New York, NJ   10022
       *Counsel for Appellees*
_____

OPINION OF THE COURT
_____

2

JORDAN, *Circuit Judge*.

Arrowpoint Capital Corp. ("Capital") appeals an order of the United States District Court for the District of Delaware denying a preliminary injunction in this action for trademark infringement and unfair competition. Invoking the Lanham Act and Delaware state law, Capital sought to enjoin Arrowpoint Asset Management, LLC; Arrowpoint Partners GP, LLC; Arrowpoint Partners GP2, LLC; Arrowpoint Fundamental Opportunity Fund, LP; and Arrowpoint Structured Opportunity Fund, LP (collectively "AAM") from using a logo or word mark employing the name "Arrowpoint" in connection with any investment-related products and services. Because the District Court's ruling rests on an overly narrow interpretation of the kind of confusion that is actionable under the Lanham Act, we will vacate and remand.

## I. Background

### A. Factual Background[1]

Capital is a Delaware holding company, whose subsidiaries, Arrowood Indemnity Company and Arrowood Surplus Lines Insurance Company, provide insurance and investment-related financial services throughout the United States under the Arrowpoint Capital name. Capital says that it began managing and investing assets derived from insurance policy premiums in 2007 and that its "primary source of income is the investment of its reserves in fixed income securities." (Opening Br. at 5.) According to Capital,

---

[1] In an appeal from the grant or denial of a preliminary injunction, we typically view the facts in the light most favorable to the prevailing party. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 840 (9th Cir. 2001) ("In an appeal from the granting of a preliminary injunction, the appellate court will view the facts most favorable to the plaintiff and all factual conflicts will be resolved in favor of the prevailing party." (internal quotation marks omitted)); *see also Utah Med. Prods., Inc. v. Searcy*, 958 P.2d 228, 232 (Utah 1998) (reviewing the denial of a preliminary injunction and explaining that under the clear-error standard of review, "an appellant must demonstrate that even in the light most favorable to the trial court, the evidence was insufficient to support the findings"); *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 602 A.2d 1277, 1280 (Pa. 1992) (noting that, in reviewing a lower court's reversal of a preliminary injunction order, the facts are "taken in a light most favorable to … the winner at the trial court level").

4

it earned more than one million dollars from investment-related services provided to third-party clients for whom it had executed nearly 1,000 trades between 2007 and 2011. Capital claims to manage about two billion dollars in assets, at least as of 2011, and to have executed over 1,200 trades for its own portfolio between 2007 and 2011. Currently, Capital owns six trademarks registered with the United States Patent & Trademark Office for insurance, investment, and consulting services, all of which feature the words "Arrowpoint Capital" or the logo **Arrowpoint Capital**.[2] It also has a pending registration for investment management services, as to which AAM has filed an opposition.[3] Capital says that it

---

[2] The trademarks are: 1) Arrowpoint Capital, Reg. No 3,484,564, a word mark registration for insurance-related services; 2) Arrowpoint Capital, Reg. No. 3,484,563, a logo registration for insurance-related services; 3) Arrowpoint Capital, Reg. No. 3,948,120, a word mark registration for business auditing services; 4) Arrowpoint Capital, Reg. No. 3,948,121, a logo registration for business auditing services; 5) Arrowpoint Capital, Reg. No. 4,132,173, a word mark registration for employee retirement plan administration and consulting services; and 6) Arrowpoint Capital, Reg. No. 4,132,172, a logo registration for employee retirement plan administration and consulting services. Registrations 3 through 6 were awarded after the District Court briefing had concluded.

[3] The proceedings before the United States Patent and Trademark Office pertaining to the seventh registration – Serial Number 77,836,169 – have been stayed pending the outcome of this litigation.

markets its investment services through presentations, sponsorships, speaking engagements, and attendance at industry conferences, and it expended approximately $390,000 between 2007 and 2011 doing so.

The AAM entities, which use the logo , include an investment management company, two private investment funds, commonly called "hedge funds," and the hedge funds' general partners – all of which are limited liability companies or limited liability partnerships organized under the laws of Delaware with their principle places of business in Denver, Colorado. The AAM entities were formed between December 2007, when AAM first began using the mark "Arrowpoint," and April 2009. They provide investment-related services, including individual investment management services and administration services for hedge funds. AAM claims to manage over $1.5 billion in assets and to serve "high net worth individuals, companies operating primarily for the benefit of wealthy individuals, family foundations, or trusts." (App. at 6.)

### B. Procedural History

On February 26, 2010, Capital filed a complaint in the District Court, asserting four claims: (1) trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114; (2) unfair competition and false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);[4] (3)

_____

[4] Although Capital labeled its second claim as one for

6

trademark infringement and misappropriation under Delaware common law; and (4) violation of the Delaware Deceptive Trade Practices Act, Del. Code Ann. tit. 6 § 2532. That same day, Capital filed a motion for a preliminary and permanent injunction to prevent AAM "from using the 'Arrowpoint' name in any form or the [AAM] logo as a trade name, trademark, or domain name in the advertising, marketing, promotion, sale, offering for sale, or distribution of [AAM's] products and services." (App. at 113-114.)

The parties engaged in discovery for several months until, on August 6, 2010, Capital moved for a scheduling order and a scheduling conference, which AAM opposed for reasons that are unclear. Two months later, the District Court issued a scheduling order allowing for limited additional discovery and setting a briefing schedule for the injunction motion. In March 2011, Capital notified the District Court that briefing was complete and requested a hearing on its injunction motion.

Over seventeen months later, on August 20, 2012, Capital filed its first motion to supplement the record, seeking to submit affidavits describing nine additional alleged instances of alleged actual confusion that took place after the

---

both unfair competition and false advertising under Section 43(a) of the Lanham Act, that was only a label. As the District Court noted, Capital "only briefed and referenced statutory language related to unfair competition." *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, No. CV 10-161-GMS, 2014 WL 2123572, at \*3 n.9 (D. Del. May 20, 2014). Accordingly, the Court only addressed the unfair competition claim.

7

parties had completed briefing on the injunction motion. Capital filed a second motion to supplement the record on April 15, 2013, seeking to submit evidence – again in the form of affidavits – of seven more instances of alleged actual confusion that had occurred since the first motion to supplement had been filed.

About four months later, on August 13, 2013, Capital submitted a letter to the District Court inquiring about the status of its pending motions. The District Court then issued an order, on September 18, 2013, denying the first motion to supplement, and another on March 25, 2014, denying the second motion to supplement. On May 20, 2014, more than four years after Capital moved for a preliminary injunction, the District Court denied Capital's motion without an evidentiary hearing. This appeal followed.

## II. Discussion[5]

Capital argues that the District Court erred in denying its motion for a preliminary injunction and the related motions to supplement the record, and it further asserts that, based on the time taken to consider its preliminary injunction motion, the case should be reassigned to a different judge on remand. We address those arguments in turn.

---

[5] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367, and we have jurisdiction pursuant to 28 U.S.C. § 1292.

8

### A. Motion for a Preliminary Injunction[6]

Preliminary injunctive relief is "an extraordinary remedy" and "should be granted only in limited circumstances." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426-27 (3d Cir. 1994) (internal quotation marks omitted). "[O]ne of the goals of the preliminary injunction analysis is to maintain the status quo, defined as the last, peaceable, noncontested status of the parties." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990) (internal citations and quotation marks omitted). The test for such relief is familiar. "A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). The "failure to establish any element [of that test] renders a preliminary injunction inappropriate."

---

[6] We review a district court's decision to grant or deny a preliminary injunction for an abuse of discretion. *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 170 (3d Cir. 2001). Any findings of fact are reviewed for clear error and conclusions of law are subject to plenary review. *Id.* "An abuse of discretion exists where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *Am. Civil Liberties Union of N.J. v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1476 (3d Cir. 1996).

*NutraSweet Co. v. Vit–Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999).

Typically, then, the first step in the analysis is to consider whether the party seeking the preliminary injunction is likely to succeed on its underlying legal claims, which, in this case, center on trademark infringement.[7] "To prevail on a claim for trademark infringement or unfair competition under the Lanham Act, the owner of a valid and legally protectable mark … must show that a defendant's use of a similar mark for its goods 'causes a likelihood of confusion.'" *Kos*, 369 F.3d at 708-09 (quoting *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir.

---

[7] Capital challenged in the District Court both AAM's use of the word mark "Arrowpoint" and the AAM logo. *See supra* p.7. As to the logos, the District Court ruled that they were so dissimilar in appearance and impression that they were not confusingly similar. On appeal, Capital offers no argument that the Court's ruling with respect to the logos was incorrect, and, thus, it has waived any argument against that ruling. *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993) ("[U]nder Federal Rule of Appellate Procedure 28(a)(3) and (5) and Third Circuit Local Appellate Rule 28.1(a), appellants are required to set forth the issues raised on appeal and to present an argument in support of those issues in their opening brief. It is well settled that if an appellant fails to comply with these requirements on a particular issue, the appellant normally has abandoned and waived that issue on appeal and it need not be addressed by the court of appeals." (internal citations omitted)).

2000)).[8]  In determining whether there is a likelihood of confusion, we have adopted a non-exhaustive list of factors, commonly referred to within our Circuit as the "*Lapp* factors*,*" based on an early case in which they were set forth. *Id.* at 709; *see also Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983).  Because some of the *Lapp* factors as initially stated were "not apposite for directly competing goods," we later "adapted [them] to make them applicable whether the products directly compete or not."  *A & H,* 237 F.3d at 212-13.  As adapted, the factors are as follows: (1) the degree of similarity between the owner's mark and the allegedly infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicating the care and attention one expects would be given when making a purchase; (4) the length of time the alleged infringer has used the mark without evidence of actual confusion arising; (5) the intent of the alleged infringer in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods are marketed through the same channels; (8) the extent to which the target markets are the same; (9) the perceived relationship of the goods, whether because of their near-identity, similarity of function, or other factors; and (10) other facts suggesting that the prior owner might be expected to expand into the alleged infringer's market. *Id.* at 215.  While the *Lapp* factors originally referred to competing products, it is clear that, because the Lanham Act protects against the use of marks which cause confusion as to "goods, *services,* or

---

[8] Because the District Court found that Capital had a valid and legally protectable trademark, and because that determination is not challenged on appeal, we do not address it. *Kost,* 1 F.3d at 182.

11

*commercial activities*," 15 U.S.C. 1125(a)(1) (emphasis added), those factors apply equally to services, like those provided by Capital and AAM. Thus, insofar as the case law uses the terms "goods" or "products" in connection with the *Lapp* factors, those terms are interchangeable with "services."

"The *Lapp* factors are best understood as 'tools to guide a qualitative decision.'" *Kos*, 369 F.3d at 709 (quoting *A & H*, 237 F.3d at 216). None of them in itself is determinative and each must be "'weighed and balanced'" based on the particular facts of the case. *Id.* (quoting *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 280 (3d Cir. 2001)). Nevertheless, one of the factors, the sixth in the *Lapp* list, is of particular significance because it focuses on evidence of actual confusion, and all of the *Lapp* factors are only proxies for the fundamental question of whether there is a likelihood of confusion from the use of similar marks. *Cf. Top Tobacco, L.P. v. N. Atl. Operating Co.*, 509 F.3d 380, 383 (7th Cir. 2007) ("A list of factors designed as *proxies* for the likelihood of confusion can't supersede the statutory inquiry."). The controversy here bears primarily on that sixth factor.

In its initial preliminary injunction briefing before the District Court, Capital submitted evidence of eleven incidents of actual confusion.[9] The District Court discounted that

---

[9] The eleven instances of actual confusion Capital offered were as follows.

(1) **April 2009**: A salesperson for the Royal Bank of Scotland ("RBS") contacted Capital to ask why Capital used a different broker for a large security purchase identified by the code

12

*******F9, given that Capital had used the RBS salesperson in the past. AAM had made the purchase at issue.

(2) **April 2009:** JPMorgan allocated a securities purchase, identified by the code *******A3, to a Capital account, when it should have been allocated to an account owned by AAM.

(3) **May 2009:** An attorney for Barclays negotiating Capital's Term Asset-Backed Securities Loan Facility ("TALF") agreement asked whether Capital was a different entity from the Arrowpoint represented by Tannenbaum Helpern. The Tannenbaum Helpern firm represented AAM, but never represented Capital.

(4) **June 2009:** JPMorgan misallocated to a Capital account a securities purchase, identified by the code *******J0, that had been made by AAM.

(5) **July 2009:** JPMorgan again misallocated to a Capital account a securities purchase, identified by the code *******L2, that had been made by AAM.

(6) **Summer 2009:** Citigroup, Inc. notified Capital that Capital's application to purchase TALF securities had been delayed due to confusion caused by AAM's submission of an application for the same securities under the "Arrowpoint" name. This caused Capital to lose its position in the queue to acquire the securities.

(7) **August 2009:** When Capital attempted to participate in a corporate bond offering through RBS, it was informed that it would not be able to do so out of Colorado – an apparent

evidence because the confusion was among brokers and dealers, rather than being "actual customer confusion." *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, No. CV 10-161-GMS, 2014 WL 2123572, at *6 (D. Del.

reference to AAM, which was based there. Eventually, after the confusion was resolved, Capital received two-thirds of the allocation it initially requested.

(8) **Fall 2009:** Morgan Stanley attempted to confirm a change in address from AAM's address in Denver to Capital's address in Charlotte.

(9) **April 2010:** Citigroup sent Capital a general request for information regarding AAM's "Arrowpoint Fundamental Opportunity Fund LP" and "Arrowpoint Structured Opportunity Fund LP."

(10) **Summer 2010:** A JPMorgan salesperson complained that Capital did not use JPMorgan for a securities purchase. The purchase had been made by AAM.

(11) **Summer 2010:** Capital received numerous calls from employees at Bank of America Merrill Lynch who were confused about whether a trade had been executed by Capital or by AAM. As a result of those calls, the bank's salespeople have had to communicate with the trading desk about which "Arrowpoint" is involved in particular transactions. The bank's employee said one such conversation lasted for approximately an hour because they had to determine which trades had been executed for Capital and for AAM, respectively, and which salespeople were assigned to each entity.

May 20, 2014). Capital argues that the District Court took too narrow a view of what constitutes actionable confusion, and we agree.

The Lanham Act defines trademark infringement as use of a mark so similar to that of a prior user as to be "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). The likelihood of confusion with which the Lanham Act is concerned is not limited to confusion of products among purchasers. For example, in *Checkpoint Systems Inc. v. Check Point Software Technologies, Inc.* and again in *Kos Pharmaceuticals, Inc. v. Andrx Corp.*, we described how the 1962 amendments to the Lanham Act broadened the scope of trademark protection. Section 32 of the Lanham Act originally proscribed only the use in commerce of similar marks where it was "'likely to cause confusion or mistake or to deceive *purchasers as to the source of origin* of such goods or services.'" *Esercizio v. Roberts,* 944 F.2d 1235, 1244 (6th Cir. 1991) (emphasis added) (quoting 1946 Lanham Act). In 1962, Congress deleted the terms "purchasers" and "source of origin," affording Lanham Act protection more broadly when a mark is "likely to cause confusion, or to cause mistake, or to deceive." *Kos*, 369 F.3d at 711 (internal quotation marks omitted); *Checkpoint*, 269 F.3d at 295; *see also* 4 *McCarthy on Trademarks and Unfair Competition* § 23:7 (4th ed.) ("Congress struck out language in the Lanham Act which required confusion, mistake or deception of purchasers as to the source of origin of such goods and services. Several courts have noted this expansion of the test of infringement and held that it supports a finding of infringement when even non-purchasers are deceived." (internal quotation marks omitted)).

15

For example, in *Country Floors, Inc. v. Partnership Composed of Gepner & Ford*, 930 F.2d 1056, 1058 (3d Cir. 1991), we reversed a District Court's grant of summary judgment in favor of a defendant, Country Tiles, where the plaintiff, Country Floors, had adduced evidence that suppliers and other business contacts confused the two entities. Specifically, Country Floors represented "(a) that Directory assistance gave a caller the number for the 'Country Tiles' Manayunk Store rather than the 'Country Floors' Philadelphia showroom; (b) that [a Country Tiles] store received a past-due notice intended for … 'Country Floors' … from a supplier whose invoice arrived in an envelope which included other materials intended for 'Country Tiles;' (c) that [the] Manager of the 'Country Tiles' Manayunk store testified that the number of inquiries about a connection between Country Floors and Country Tiles at the Manayunk store had increased from very few to a noticeable amount; and (d) that [an] interior designer …, who is not affiliated with Country Floors, had confused the two stores." *Id.* at 1064. Most of this evidence did not involve customer confusion, but, nonetheless, we held that it was "evidence of actual confusion" sufficient to defeat summary judgment because "a factfinder could conclude there was actual confusion between the ... names as well as the[] marks." *Id.*

Similarly, in *Mid-State Aftermarket Body Parts, Inc. v. MQVP, Inc.*, 466 F.3d 630, 634 (8th Cir. 2006), the United States Court of Appeals for the Eighth Circuit reversed a summary judgment ruling that was grounded on a misguided likelihood-of-confusion analysis. The district court's decision had "emphasized that distributor Mid-State does not offer services that compete with the MQVP services protected by

16

the mark, and that Mid-State's customers are collision shops who are parts end users, not the manufacturers and distributors who are potential purchasers of MQVP's services." *Id.* The Eighth Circuit observed, however, that "the Lanham Act's unfair competition inquiry is not so narrow." *Id.* Rather, that court held, "'[c]onfusion is relevant when it exists in the minds of persons in a position to influence the purchasing decision *or* persons whose confusion presents a significant risk to the sales, goodwill, or reputation of the trademark owner.'" *Id.* (emphasis added) (quoting *Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8, 10 (1st Cir. 2004)).

A number of other decisions both within our circuit and beyond have likewise highlighted that the Lanham Act extends to "the use of trademarks which are likely to cause confusion, mistake, or deception *of any kind*, not merely of purchasers nor simply as to source of origin." *Kos*, 369 F.3d at 711 (internal quotation marks omitted) (quoting *Syntex Labs., Inc. v. Norwich Pharmacal Co.*, 437 F.2d 566, 568 (2d Cir. 1971)); *see also, e.g.*, *Checkpoint*, 269 F.3d at 295 (overly narrow view of confusion "would undervalue the importance of a company's goodwill with its customers"); *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1118 (7th Cir. 1997) (context of confusion "immaterial" because any injury to goodwill or loss of control over reputation is actionable); *Champions Golf Club, Inc. v. Champions Golf Club, Inc.*, 78 F.3d 1111, 1119-20 (6th Cir. 1996) (relevant evidence of confusion goes beyond purchaser confusion and includes "confusion among nonpurchasers" in order to "protect the manufacturer's reputation" (internal quotation marks omitted)).

17

The analysis provided by the United States Court of Appeals for the Second Circuit in *Morningside Group, Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133 (2d Cir. 1999), is particularly relevant because, like the present case, it involved the highly regulated financial industry. There, the plaintiff presented at trial "extensive evidence of phone calls and other inquiries received by its people from sophisticated members of the financial community, both about [the defendant's] transactions and about the relationship between the two entities." *Id.* at 141. "Nonetheless the district court discounted that evidence because it relied on an inordinately narrow definition of actual confusion." *Id.* The Second Circuit held that, "[c]ontrary to the district court's approach, evidence of actual confusion need not be limited to evidence of mistaken *completed* transactions. … [C]ourts can properly take into account evidence of either a diversion of sales, damage to goodwill, or loss of control over reputation." *Id.* (internal quotation marks omitted). Recognizing the particular importance of identity and reputation to financial firms, the Court noted that "the relevance of actual confusion beyond mistaken completed transactions is important ... because in the financial world an investor will almost never complete a transaction with a mistakenly identified party. If nothing else, compliance with the due diligence requirement will normally prevent such errors." *Id.* The Second Circuit warned that, before a transaction is done, "investors might be confused about the affiliation between two similarly named companies and might very well alter their behavior based on that confusion." *Id.*

In the present case, the District Court cited the correct standard when it stated that "the [Lanham] Act covers 'the use of trademarks which are likely to cause confusion,

18

mistake, or deception *of any kind*, not merely of purchasers nor simply as to source of origin.'" *Arrowpoint*, 2014 WL 2123572, at *4 n.11 (quoting *Kos*, 369 F.3d at 711). But the Court did not then appear to apply that standard; instead it repeatedly discussed the lack of *customer* confusion. It said, for example, that "the plaintiff produced no evidence of actual customer confusion. … [I]t argues that 'broker dealers' … all have been misled." *Id.* at *6. Similarly, it concluded that, as a matter of law, there was no general likelihood of confusion, "especially since the record is devoid of any inference of *customer* confusion." *Id.* at *7 (emphasis added). And, rather than recognizing the special importance of identity and reputation in the financial industry, it discounted such concerns, saying that similar marks can coexist because "consumers take greater care than many others," and "'prospective purchasers are unlikely to perceive the marks before becoming familiar with the parties' businesses.'" *Id.* at *5 & n.15. That overly narrow interpretation of what constitutes confusion under the Lanham Act is contrary to our deeply rooted precedent, including our decisions in *Checkpoint*, *Kos*, and *Country Floors*. We thus take this opportunity to reiterate that the Lanham Act protects against "the use of trademarks which are likely to cause confusion, mistake, or deception *of any kind*, not merely of purchasers nor simply as to source of origin." *Kos*, 369 F.3d at 711 (internal quotation marks omitted). It certainly covers confusion created "'in the minds of persons in a position to influence [a] purchasing decision or persons whose confusion presents a significant risk to the sales, goodwill, *or* reputation of the trademark owner.'" *Mid-State*, 466 F.3d at 634 (emphasis added) (quoting *Beacon*, 376 F.3d at 10).

19

AAM cites our decision in *Checkpoint*, arguing that somehow it stands for the proposition that the "absence of evidence of actual consumer confusion in a purchasing decision" defeats a claim for infringement. (Answering Br. at 32.) But that interpretation of the case is flawed. First, our consideration of actual confusion evidence in *Checkpoint* fell in the middle of a lengthy discussion of whether initial-interest confusion – as opposed to point-of-sale confusion – was actionable under the Lanham Act. 269 F.3d at 292-99. Almost all of our analysis on the issue of confusion related to that question, which we answered in the affirmative.[10] Second, while we expressly reserved judgment as to whether investor confusion is actionable – a reservation prompted by the lack of evidence in the case – we nevertheless noted that "[a]rguably, the 1962 amendments to the Lanham Act extended actionable confusion beyond purchasers to other instances affecting a party's business or goodwill." *Id.* at

---

[10] In reaching the conclusion that initial-interest confusion was actionable, we cited to 3 *McCarthy on Trademarks & Unfair Competition* § 23.7 for the proposition that:

> In 1962, Congress struck out language in the Lanham Act which required confusion, mistake or deception of purchasers as to the source of origin of such goods and services. Several courts have noted this expansion of the test of infringement and held that it supports a finding of infringement when even non-purchasers are deceived.

*Id.* at 295 (internal quotation marks omitted).

300. We went on to recognize that "[i]nvestor confusion may well threaten a party's business or goodwill if it would likely deter or inhibit a company's ability to attract investors and raise capital." *Id.* In short, *Checkpoint* does not stand for the proposition that non-purchaser confusion is not actionable under the Lanham Act or that it is less important than customer confusion. There was simply insufficient evidence of any kind of confusion in *Checkpoint* to support a claim, and the case therefore does not shore up AAM's position.

AAM also argues that the District Court's decision did not turn on whether non-purchaser confusion was actionable but rather on whether Capital's evidence deserved to be given weight. According to AAM, the District Court discounted the evidence of confusion among non-purchasers because it came in the form of "self-serving affidavits of [Capital's] employees relating hearsay." (Answering Br. at 28.) And the District Court did in fact say that it "view[ed] many of the alleged inquiries about the affiliation between the parties with great skepticism, given the interested sources and the inability to cross examine the supposedly confused individuals." *Arrowpoint*, 2014 WL 2123572, at *7 (quoting *A & H*, 237 F.3d at 227).

But, even if AAM were correct that the legal error concerning the test for confusion had no impact on the District Court's decision – a premise we do not accept – the argument that the Court was just weighing evidence would fail. No doubt, a district court called upon to weigh evidence may give little credence to that which it deems unreliable, *Kos*, 369 F.3d at 719, but it must demonstrate that its decision in that regard is supportable. Here, the District Court did not conduct an evidentiary hearing prior to ruling on the

21

preliminary injunction, yet it refused to credit evidence because of perceived credibility issues with the affiants and because there was no opportunity to cross examine the individuals who were confused. While an evidentiary hearing is not always required before resolving a preliminary injunction, *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175-76 (3d Cir. 1990) (describing various scenarios in which a hearing would be unnecessary), we have noted that it "may be improper to resolve a preliminary injunction motion on a paper record alone; [and] where the motion turns on a disputed factual issue, an evidentiary hearing is ordinarily required," *Kos*, 369 F.3d at 719 n.16. The record here does not indicate that either party expressly asked for an evidentiary hearing, although Capital claims that it made an oral motion to the District Court. Nonetheless, because consideration of the injunction motion evidently was influenced in some significant degree by credibility issues and factual disputes, the District Court should have conducted one. *See Prof'l Plan Exam'rs of N.J., Inc. v. Lefante*, 750 F.2d 282, 288 (3d Cir. 1984) (a district court cannot resolve a motion for a preliminary injunction that depends upon the resolution of disputed issues of fact without first holding an evidentiary hearing); *CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 265 F.3d 1193, 1207 (11th Cir. 2001) ("Without the benefit of an evidentiary hearing, the district court erred in rejecting [the litigant's] assertions as not credible.").[11]

---

[11] S*ee also, e.g.*, *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 553 (6th Cir. 2007) ("[I]f questions of fact had been in dispute, an evidentiary hearing would have been required."); *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004) ("[I]f there are genuine issues of material fact raised in opposition to a

Moreover, we reject AAM's argument that the District Court was entitled to entirely discount hearsay affidavits at the preliminary injunction stage. It is true that we have held that a district court may reject unreliable affidavits in evaluating evidence of actual confusion. For example, in *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, we held that a district court was right to view "with great skepticism" evidence entirely coming from interested sources who were not subject to cross examination and were otherwise isolated or exceptional. 237 F.3d at 227. We noted that "[i]t is within the District Court's discretion to consider the facts, and weigh

---

motion for a preliminary injunction, an evidentiary hearing is required. Particularly when a court must make credibility determinations to resolve key factual disputes in favor of the moving party, it is an abuse of discretion for the court to settle the question on the basis of documents alone, without an evidentiary hearing." (citations omitted)); *Medeco Sec. Locks, Inc. v. Swiderek*, 680 F.2d 37, 38 (7th Cir. 1981) ("It is well established that, in general, a motion for a preliminary injunction should not be resolved on the basis of affidavits alone. Normally, an evidentiary hearing is required to decide credibility issues."); *Forts v. Ward*, 566 F.2d 849, 851 (2d Cir. 1977) (same); *Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*, 446 F.2d 353, 356 (5th Cir. 1971) (same); *Consolidation Coal Co. v. Disabled Miners of S. W. Va.*, 442 F.2d 1261, 1269-70 (4th Cir. 1971) (same); 11A Charles Allen Wright, et al., *Federal Practice and Procedure* § 2949 (3d ed. 2014) (noting that while an evidentiary hearing is not always required, there is a "strong preference … for oral evidence" in preliminary injunction proceedings and that most courts require an evidentiary hearing where there are disputed facts).

them." *Id.* And, we have made similar statements in other cases. *See, e.g.*, *Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 122 (3d Cir. 2004) ("In general, actual confusion evidence collected by employees of a party in a trademark action must be viewed with skepticism because it tends to be biased or self-serving." (internal quotation marks omitted)); *Checkpoint*, 269 F.3d at 298 ("[T]he District Court properly took into account the potential bias of Checkpoint Systems's employees who testified [regarding actual confusion]."). None of those cases, however, were decided upon an application for a preliminary injunction; rather, they were decisions made at later stages of each case. That procedural distinction explains why the self-serving hearsay affidavits in *Kos*, a case involving a preliminary injunction, were sufficient, but the same kind evidence was not enough to sustain a judgment for the plaintiff in *Checkpoint*.

In rejecting the argument that hearsay affidavits were inadequate to entitle a movant to preliminary relief in *Kos*, we explained that temporary injunctions are "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial" or at summary judgment because there is no "rule in the preliminary injunction context akin to the strict rules governing the form of affidavits that may be considered in summary judgment proceedings." 369 F.3d at 718. *Cf. E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 196 & n.8 (3d Cir. 2008) ("We have explained the importance of the distinction between the preliminary injunction and summary judgment stages of litigation ... . The distinction between the two standards remains as important in the context of weighing the results of a survey as in making credibility determinations... ."); 11A

24

Charles Allen Wright, et al., *Federal Practice and Procedure* § 2949 (3d ed. 2014) ("[I]t is not surprising that in practice affidavits usually are accepted on a preliminary injunction motion without regard to the strict standards of Rule 56(c)(4), and that hearsay evidence also may be considered." (footnotes omitted)). It also appears that at least some of these allegedly unsubstantiated affidavits actually had email communications pertaining to the confusion attached as exhibits. We offer no opinion as to whether the District Court should credit those submissions, but it is not enough to simply dismiss them as self-serving. One would hardly expect them to be otherwise. No party is likely to submit evidence that does not serve its case.

In sum, despite credibility questions, the District Court failed to hold an evidentiary hearing, or to adequately set forth its rationale for discounting Capital's evidence, or to hear oral argument. On this record, those failings amount to error.

Because we conclude that the District Court erred in its actual confusion analysis and its treatment of Capital's evidence of confusion, we need not address the remaining *Lapp* factors.[12] We agree with Capital that the District

---

[12] The District Court found that the length of time the defendant used the mark without actual confusion arising is neutral because "[t]he court is unable to thoroughly assess this factor given the nature of the alleged 'actual confusion'" *Arrowpoint*, 2014 WL 2123572, at *7; customer care and sophistication, "strongly favor[ed] the defendants [AAM]" *Id.*; AAM adopted the mark in good faith and thus that factor favored AAM; channels of advertising factor favored

25

Court's overly narrow view of what constitutes confusion under the Lanham Act affected its analysis of the other *Lapp* factors and the District Court should revisit its rulings in the first instance in light of the forgoing discussion.[13] *Kos*, 369 F.3d at 712 (stating that normally the application of an incorrect legal standard results in a remand for the district court to rule in the first instance using the correct standard).[14]

---

defendant because the parties use different media; and the customer bases are similar but because the parties offered "distinctly different investment management strategies to generally different classes of investors" that factor favored defendants. *Id.* at *8.

[13] While the delay in this case is troubling – we are dealing with an application for preliminary relief dating back four years – we reject the suggestion that the District Judge cannot ably and fairly address the case. Our reasons for denying the request for reassignment are set forth herein. *See infra* pp. 35-37.

[14] We do, however, take this opportunity to note some difficulty with the District Court's analysis of AAM's intent in adopting the mark. AAM admitted that it knew Capital was using the "Arrowpoint" name in the insurance industry before it began using it. That admission was necessary because, prior to adopting the "Arrowpoint" name, AAM had conducted a trademark search that revealed that Capital was already using "Arrowpoint" in connection with both insurance and financial services. AAM said it did not think Capital's use of "Arrowpoint" for insurance services would preclude it from using "Arrowpoint" for investment services and the District Court accepted that explanation, finding that

Because the District Court determined that Capital could not show a likelihood of success on the merits, it did not analyze the remaining three factors for preliminary relief. If, on remand, the District Court reaches a different conclusion on the likelihood of success, it will, of course, need to address one or more of those factors as it assesses Capital's request for an injunction. *See, e.g.*, *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 369 (3d Cir. 2007) ("[W]e will therefore remand for the District Court to consider whether [Appellant] establishes a likelihood of success on the remaining elements of trade dress infringement under the Lanham Act, as well as the remaining factors for preliminary injunctive relief."); *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 167 (3d Cir. 1999) ("On remand, the District Court should reassess – in light of this opinion – the three remaining factors in the four-factor

---

AAM adopted the name in good faith. Since insurance companies invest customer premiums in various financial instruments as a primary source of profits, however, *see, e.g.*, Robert McMenamin et al., *What do U.S. life insurers invest in?* The Federal Reserve Bank of Chicago, Chicago Fed Letter No. 309 at tbl. 1 (April 2013) (explaining that, in the fourth quarter of 2011, life insurers held about $3.5 trillion in assets, over $3.3 trillion of which were invested in various financial instruments); *see also* Opening Br. at 5 ("[Capital]'s primary source of income is the investment of its reserves in fixed-income securities"), the closely related character of the markets for insurance services and for investment services warranted closer consideration. Again, we do not have any fixed opinion on this point, but the answer does not appear to us as evident as it seems to have been to the District Court.

27

determination of whether a preliminary injunction should issue."); *Home Instead, Inc. v. Florance*, 721 F.3d 494, 500 (8th Cir. 2013) ("The district court is in the best position to evaluate all of the evidence and weigh the factors to determine whether the injunction should issue." (internal quotation marks omitted)). We offer no opinion as to whether Capital is entitled to preliminary relief. [15]

### B.    Motion to Supplement[16]

Capital also challenges the District Court's denial of its motions to supplement the record with additional evidence of actual confusion. Specifically, while its motion for

---

[15] It must be said, however, that, directly contrary to Capital's suggestion that a showing of actual confusion creates a presumption of irreparable harm, we recently held in light of two recent Supreme Court cases, *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), and *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), that "a party bringing a claim under the Lanham Act is not entitled to a presumption of irreparable harm when seeking a preliminary injunction and must demonstrate that irreparable harm is likely." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 206 (3d Cir. 2014).

[16] We review for abuse of discretion the District Court's decision on the motions to supplement the record. *See Bradley v. Work*, 154 F.3d 704, 709 (7th Cir. 1998) ("We also find no abuse of discretion – the appropriate question – in the district court's refusal to allow the Voters to supplement the record … ." (citation omitted)).

preliminary relief was pending, Capital sought to supplement the record twice. On August 20, 2012, it filed a motion for leave to supplement the record with nine additional instances of what it describes as actual confusion.[17]   Capital later

---

[17] The additional confusion evidence consisted of the following.

**(1) Spring 2011:** An analyst at Morgan Stanley contacted Capital to request an allocation for a bond trade.  When asked to verify that the trade was for Capital, the analyst advised that it actually was for "Arrowpoint Asset" and asked whether Capital was affiliated with Arrowpoint Asset. (App. at 205.)

**(2) Summer 2011:** Capital was contacted by a representative of Goldman Sachs and asked to confirm and allocate a trade placed by an employee of AAM.

**(3) Fall 2011:** A Barclays representative commented on Capital's attendance at an upcoming securities conference. Capital had not yet signed up to attend.  The Barclays representative explained that she had seen a list of attendees that included "Arrowpoint Partners." (*Id.* at 182-184, 189).

**(4) Spring 2012:** While attending a conference, Capital representatives introduced themselves to two employees of Solamere Advisors, an investment and wealth management firm.  The Solamere Advisors employees said they had heard of Capital and had looked at the company's "funds" while evaluating funds for clients. (*Id.* at 191-92.)  Only AAM offers such funds.

**(5) Spring 2012:** Capital placed a multi-million dollar order for a new issue bond offered by RBS, Deutsche Bank, and UBS, but received no allocation in that offering because the syndicate desk handling the transaction had mistakenly believed it was placed by "the Arrowpoint in Colorado," a "fast money" account or a "hedge fund." (*Id.* at 194-95.) Capital's contact at RBS explained the syndicate desk's mistaken assumption, but by that time there was no way to rectify the mistake.

**(6) Summer 2012:** A Credit Suisse salesperson called Capital to inquire about a report from his syndicate desk that "Arrowpoint" – evidently AAM – had placed a multi-million dollar order for a security. (*Id.* at 181-82.)

**(7) Summer 2012:** A Wells Fargo salesperson asked whether Capital had placed an order for several million dollars in securities. Upon investigating, the salesperson reported that the buyer was "Arrowpoint Asset Management in Denver." (*Id.* at 181.)

**(8) Summer 2012**: A Morgan Stanley representative contacted Capital to confirm a multimillion dollar fixed-income trade that had been booked to "Arrowpoint Capital." (*Id.* at 204.) The representative said the trader was "Kaelyn" at telephone number (303) \*\*\*-\*\*\*\*. The telephone number was to AAM's Denver office for one of AAM's traders.

**(9) Summer 2012:** A representative of Bank of America Merrill Lynch contacted Capital by email to inquire about a trade that had been rejected. The email, with the salutation "Team," had two additional addressees, both employed by

30

discovered at least six more examples of actual confusion and moved to supplement the record a second time on April 15, 2013.[18] The District Court denied both motions – on

AAM. (*Id.* at 203-04, 208-09.) The bank representative then called Capital to ask whether it had another entity, because she noticed that the trade said "Arrowpoint Asset Management." (*Id.*) She later reported AAM had confirmed "this was their trade." (*Id.*)

[18] That evidence consisted of the following.

**(1) Fall 2012:** Capital asked its contact at State Street Bank to provide a list of authorized signers for its bank account. The bank contact forwarded a list of authorized signers consisting of two pages. The first page listed authorized signatories for Capital and the second page listed authorized signatories for AAM. When informed of this error, the bank contact explained that the information he forwarded had been pulled from an electronic database through a search by name – indicating that the employee searched for "Arrowpoint."

**(2) Fall 2012:** An RBS manager contacted Capital about a money difference in a multi-million dollar trade. Capital learned that the trade had been made by AAM because the customer was identified as "ARROWPOINT ASSET MGMT-GS."

**(3) Fall 2012:** Capital and Barclays jointly participated in a trial to evaluate a risk management system. Barclays set up access for Capital's employees, but mistakenly listed the firm name as "Arrowpoint Asset Management, LLC." When asked about the mistake, the contact at Barclays responded

31

that he thought Capital and AAM were both part of the same entity, which he called "Arrowpoint."

**(4) Winter 2013:** A Morgan Stanley employee called Capital to get account details for trades it had allocated to Capitals' account. Capital could not identify these trades by the numbers given, so it asked for the name of the trader. The name provided was that of a trader employed by AAM. The Morgan Stanley employee, upon realizing this, stated that he must have been confused, and that the trades must have been made by the other Arrowpoint.

**(5) Winter 2013:** A Credit Suisse employee contacted Capital to ask whether it had submitted orders in a deal in which Wells Fargo or Barclays were other leads. The employee said his syndicate desk had seen an "Arrowpoint" in the other banks' order books and wanted to know whether this referred to Capital or AAM.

**(6) Winter 2013:** A Royal Bank of Canada Capital Markets employee contacted Capital to say he had learned from his syndicate desk that Capital had placed a multi-million dollar order for an asset-backed security. Although Capital had analyzed this offering, it had not yet decided to buy. The bank employee later reported that the order actually was placed by an "Arrowpoint" in Denver, and he apologized for the trouble caused by his confusion.

**(7) Spring 2013:** A reporter for Creditflux, an independent report on credit trading and investing, contacted Capital to confirm a tip from market sources that "Arrowpoint" was about to get involved in structured credit by launching a

September 18, 2013 and March 25, 2014, respectively – without explanation.

Capital argues that the delay in deciding the motion for preliminary relief necessitated the filing of supplemental information and that the District Court had no basis for denying the motions to supplement because the evidence to be submitted was probative of actual confusion. *See Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 597 (5th Cir. 1985) (stating that "there is simply no precedent" for the "total disregard of evidence of actual confusion"); *McCarthy* § 23:13 ("No matter how convinced a trial judge may be of the absence of any likelihood of confusion, he or she must at least listen to evidence presented of actual confusion."). AAM counters that the District Court rejected the evidence because it was more of the same self-serving hearsay that the Court had previously declined to accept and that AAM would have been prejudiced by having to respond to the additional evidence of confusion nearly seventeen months after the record closed.

---

collateral debt obligation, known as a "CLO." Capital had no such intention. When asked whether he was sure he had the right company, the reporter responded by asking whether he was speaking with "Arrowpoint Capital." Capital asked the reporter whether he was seeking the Denver-based AAM, and the reporter confirmed that he was in fact looking for the Denver-based firm. A few weeks later, a *Business Wire* news item reported that AAM had launched a CLO. The item referred to AAM's company name as "Arrowpoint" and to the new product as "Arrowpoint CLO 2013-1."

We are faced with the difficulty of evaluating the District Court's rulings in this regard when they are wholly unexplained. It would ordinarily be within the District Court's discretion to set a deadline for submissions in deciding a temporary restraining order or preliminary injunction and to refuse to accept supplemental filings submitted after that deadline – although the significant delay in this case would give us cause to doubt the wisdom and viability of such a decision if that is what happened here. On the other hand, if the District Court refused to grant the motions because the affidavits contained hearsay, it would likely have erred for the reasons we have already described. Because we are unable to discern the basis for the District Court's rulings on the motions to supplement and because we are vacating the denial of the preliminary injunction on other grounds, we will also vacate the denial of the motions to supplement and ask the District Court to revisit its ruling in light of this opinion.

## C. Motion for Reassignment[19]

Finally, Capital asks us to reassign the case to a different district judge on remand, arguing that the delay in ruling on the motion for preliminary relief and the adverse evidentiary rulings call into question the judge's impartiality. We strongly disagree.

Reassignment is "an exceptional remedy, one that we weigh seriously and order sparingly." *United States v.*

---

[19] Our authority to direct the reassignment of a case on remand is based on 28 U.S.C. § 455(a) and 28 U.S.C. § 2106. *United States v. Bertoli*, 40 F.3d 1384, 1411 (3d Cir. 1994).

*Kennedy*, 682 F.3d 244, 258 (3d Cir. 2012). "To warrant reassignment under § 455(a), a case generally must involve apparent bias deriving from an extrajudicial source, meaning something above and beyond judicial rulings or opinions formed in presiding over the case." *United States v. Bergrin*, 682 F.3d 261, 282 (3d Cir. 2012). "Our supervisory powers under § 2106, however, also permit reassignment and are not necessarily constrained by that limitation." *Id.* Notwithstanding the differences between the standards for reassignment under § 455(a) and § 2106, we have typically reviewed requests for reassignment under both provisions applying a standard that calls for reassignment when "'a reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned.'" *Id.* (quoting *United States v. Wecht*, 484 F.3d 194, 213 (3d Cir. 2007)).

Here, it is clear that reassignment is not warranted. We have never held that delay alone merits reassignment. Further, the cases Capital cites for the proposition that delay alone can warrant reassignment – *Brooks v. Central Bank of Birmingham*, 717 F.2d 1340, 1343 (11th Cir. 1983) and *Yang v. City of Chicago*, 137 F.3d 522, 527 (7th Cir. 1998) – are inapposite. In *Brooks*, the court of appeals ordered reassignment because the district court repeatedly demonstrated hostility toward certain provisions of the Civil Rights Act of 1964 and ruled that the appointment of counsel violated the Thirteenth Amendment. 717 F.2d at 1342-43. Similarly, the reassignment in *Yang* was not based on the district court's delay, but instead was pursuant to a local rule providing for reassignment whenever a case is remanded for a new trial. *Yang*, 137 F.3d at 527 (ordering reassignment because of Seventh Cir. L.A.R. 36).

35

Further, adverse rulings – even if they are erroneous – are not in themselves proof of prejudice or bias. *See, e.g.*, *Liteky v. United States*, 510 U.S. 540, 555 (1994) ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion [under § 455(a)]" since they rarely "evidence the degree of favoritism or antagonism required ... when no extrajudicial source is involved"); *Securacomm Consulting, Inc. v. Securacom, Inc*., 224 F.3d 273, 278 (3d Cir. 2000) ("[A] party's displeasure with legal rulings does not form an adequate basis for recusal."); *Jones v. Pittsburgh Nat'l Corp*., 899 F.2d 1350, 1356 (3d Cir. 1990) ("Disagreement with a judge's determinations certainly cannot be equated with the showing required to so reflect on his impartiality as to dictate recusal.").

Indeed, after careful consideration of the record, we find no evidence of bias in the district judge's handling of the case. To the contrary, the judge appears to have been completely impartial and we have high confidence in him as a jurist. Because we are satisfied that he will handle this case in a fair and expeditious manner, the request for reassignment will be denied.

## III. Conclusion

For the forgoing reasons, we will vacate the rulings at issue and remand the case for further proceedings consistent with this opinion.